Ralston, Appellant, *v.* Baldwin Locomotive Works.

Argued November 20, 1944. Before KELLER, P. J., BALDRIGE, RHODES, HIRT, RENO and JAMES, JJ.

*Frank R. Ambler,* for appellant.

*E. Wallace Chadwick,* for appellee.

OPINION BY KELLER, P. J.:

Claimant was employed by defendant as an outside guard at its Eddystone works. While at work on October 25, 1941 he was struck on the head with great force by a suddenly opened door of an automobile, knocking him down, and, according to his testimony, rendering him unconscious. A police car was summoned

and he was driven to the defendant's dispensary, half a mile away, where it was noted on the dispensary records, "Patient's nose bleeding, had much swelling, eye black and blue area over both eyes, right eye worse, blood pressure 187/128, temperature 97.2, pulse 90, respiration 30". The dispensary records did not show whether he was conscious or unconscious when brought there. The assistant physician in charge had an x-ray taken which showed a fracture of the skull. After about an hour and a half in the dispensary he was removed in an ambulance to the Chester Hospital where he remained for nearly four weeks.

On November 12, 1941 a compensation agreement for total disability (No. 3,949,600) which was prepared by the employer—the claimant had no recollection whatever of the circumstances attending the injury—was signed, under which he was paid compensation until January 5, 1942 when he returned to work. He testified that when the company's doctor, who had attended him, asked him how he felt, he told him "I feel fairly good outside of pains [headaches] and dizzy spells". The doctor then said, "I am going to order you back [to work] January 5th if you think you are able". Claimant was anxious to try it, and signed a final receipt on January 7, 1942. At first he was given a night shift job which required him to go up and down stairs in buildings. As this made him dizzy and light-headed, he was transferred to a day job, where he worked with considerable discomfort, he stated, due to his recurrent dizziness and pains in the head, until March 26, 1942, when he was discharged, ostensibly for 'insubordination' or 'disobedience of orders', because he refused to sign a waiver releasing the Borough of Eddystone from liability arising out of his employment as a borough peace officer, when asked to do so by his employer. In our opinion, his refusal to sign this waiver was not 'insubordination', and the company was not warranted in so calling it. If the United States Government, for rea-

sons of its own insisted that guards employed at defendant's plant should be peace officers appointed by the Borough of Eddystone, this claimant was entirely within his legal rights in refusing to sign the waiver of liability requested by the borough. He might find that he had signed away rights essential to his own protection. The employer was not justified in blackening his record by calling his action 'insubordination' or 'disobedience of orders'. It had no right to give him any such *'order'*.

On April 13, 1942 claimant presented a petition asking the board to set aside the final receipt signed by him, giving as the reason that he was "unable to do any *heavy* work as a result of his accident". He did not allege 'total disability'.

The employer filed an answer averring that claimant "is not now disabled from performance of regular work"; and that he "performed his regular duties from January 5, 1942 to March 26, 1942, on which date he was discharged for disobedience of orders". It specifically stated that the ground for its objection to setting aside the final receipt was, "no disability".

The referee, after a full hearing, at which physicians called by both claimant and defendant testified, filed his decision holding, in substance, that the claimant at the time of his injury on October 25, 1941, had suffered a post concussion syndrome, which was not known to him or to defendant's doctor when claimant signed the final receipt and went back to work, and which caused him persistent headaches, dizziness, weakness in his limbs and general weakness, intermittently, and resulted in a 50% partial disability. Accordingly he entered an order setting aside the final receipt, as signed under a mistake of fact, and re-instating agreement No. 3,949,600, but modifying it so as to provide for the weekly payment of only $10.32 from March 27, 1942, to continue until his partial disability ceases or is changed.

On appeal by the employer to the board that body affirmed the referee's decision and order, but modified and enlarged the findings of fact and substituted its own conclusion of law, making them read as follows:

"FINDINGS OF FACT.

"1. That the claimant at the present time and since the time of the injury on October 25, 1941, has had post concussion syndrome.

"2. [We find] as a fact that at the time the claimant returned to work January 5, 1942, and continuing until March 26, 1942, he was suffering with persistent headaches, dizziness, weakness in the limbs and general weakness intermittently, which was caused by post concussion syndrome following the accident of October 25, 1941.

"3. [We find] as a fact that the claimant was suffering from post concussion syndrome, and mistakenly thought he could continue with his work as a guard at the time he signed the final receipt in the case.

"4. That it is possible for the claimant to do some light type of work; that the status of his disability has changed and that he is still suffering a 50% partial disability as a result of the accident, which 50% disability reflected itself in a loss of earning power on March 27, 1942.

"5. We find as a fact that the compensation agreement which was terminated by the final receipt did not cover all of the claimant's injuries since it made no mention of a post concussion syndrome.

"6. We find as a fact that neither the claimant nor the defendant had knowledge of the full extent of claimant's injuries as a result of the post concussion syndrome at the time of the final receipt and that this lack of knowledge constituted a mutual mistake of fact entitling the claimant to have the final receipt set aside."

"CONCLUSION OF LAW

"Since neither the claimant nor the defendant had

knowledge of the full extent of claimant's injuries as a result of the post concussion syndrome at the time of the execution of the final receipt, there was a mutual mistake of fact which entitled the claimant to an order setting aside his final receipt; and since the claimant is 50% partially disabled as a result of this accident, he is entitled to compensation in accordance therewith."

The employer appealed to the Court of Common Pleas.

The Court, without deciding whether there was competent evidence to support the board's finding that there was a mutual mistake of fact when the final receipt was signed, set aside the order of the board and entered judgment for the defendant, because it was "convinced that the finding of the compensation authorities of a fifty per cent loss of earning power, by reason of the accident, is without support in the testimony." President Judge MacDade dissented.

Unless there was *no* competent evidence to support the finding of a mutual mistake of fact, the order of the court below would have to be reversed; for, if there was such supporting evidence and there was *any* disability resulting from the accident—even though 50% disability was not established—the record should have been remitted to the board for further hearing to determine more accurately what the percentage of disability or loss of earning power was. Sec. 427 of the Act of 1939, P. L. 520, p. 557; *Tomlinson v. Hazle Brook Coal Co.*, 116 Pa. Superior Ct. 128, 176 A. 853.

But our review of the record satisfies us not only that the board's findings as to a mutual mistake of fact existing at the signing of the final receipt are supported by sufficient competent evidence, but also that the evidence was such as to justify an inference of 50% disability and a finding to that effect by the referee and board, and that the order of the board should stand.

The board's findings as to the mutual mistake of fact

are supported by the testimony of Dr. Joseph B. Yaskin of Philadelphia, the expert physician called as a witness by claimant, a specialist in nervous and mental diseases, chief physician at the Philadelphia General Hospital and the Graduate Hospital, and professor of Neurology at the University of Pennsylania and the Graduate School of Medicine. He said that, in his opinion, the claimant now has, and has had since his injury in October, 1941, post concussion syndrome, a concurrence of symptoms characterized by depressing headaches, dizziness, weakness of the limbs, etc., following a cranial trauma in which there is a concussion of the cerebral distributions, accompanied by some loss of consciousness, due to trauma, and some injury to the brain tissue.

Dr. Gabrial A. Schwarz, the expert physician called by the defendant, agreed with Dr. Yaskin that claimant "had post concussion syndrome without question", but was of opinion that "his symptomology [was] out of proportion to the injury sustained"; that the amount and duration of the symptoms were out of proportion to the incidents immediately following the accident; and that his "complaints are not *totally* the result of the injuries which he sustained". When asked on cross-examination, "Let me ask you this: Can he have a severe cerebral concussion without unconsciousness?", he answered, "No, I would say not, I don't believe it". He admitted that the claimant had "traumatic amnesia", and said that the degree of loss of memory depended on the severity of the concussion.

From all of which it is established that the claimant did suffer a post concussion syndrome, but no mention of it was made in the compensation agreement, and that the degree of severity of the post concussion syndrome was a fact to be found by the board from all the evidence; and it chose to accept the testimony of Dr. Yaskin.

Dr. Schwarz assumed from the testimony of one or two persons, who were present shortly after the accident, and the records of the hospital—as distinguished from the dispensary—that claimant was not unconscious, although dazed and drowsy and unable to recall what had happened; but the evidence is that over an hour and a half elapsed after the accident before he was taken to the hospital, and Dr. Yaskin said a half hour's unconsciousness would be sufficient to account for claimant's symptoms of post concussion syndrome. Claimant; himself, testified he was unconscious for two days following the accident. The lay witnesses may have thought that to be 'unconscious' required one to be in a state of coma, or swoon, apparently lifeless. 'Unconscious' implies only want of consciousness; and 'consciousness' is defined by Webster to be: "5. The normal state of conscious life, as distinguished from sleep, trance, fever, etc." A man in a delirium is unconscious; so is a sleepwalker; and a man so badly injured about the head as to fracture his skull and require hospitalization for four weeks, who has no recollection of the events following his accident for two days, may well be 'unconscious', even though able to talk as if he were in some respects conscious.

In any event that was a question of fact for the decision of the board, and where there is substantial competent testimony to support it, as there was here, courts cannot interfere with it nor disturb it.

There is no merit in the defendant's contention that as the claimant knew he had headaches and dizziness when he signed the final receipt and went back to work, there could be no mistake of fact. He did not know he had post concussion syndrome; nor did the defendant's doctor, who then treated him. Post concussion syndrome is characterized by severe headaches and dizziness, etc.; but not every severe headache or spell of dizziness is caused by or attributable to post concussion

syndrome. Post concussion syndrome is an injury to the brain tissue that may follow a severe concussion of the brain, caused by trauma, and is as distinct as a fracture of the skull or an injury to some other organ of the body. See *McKissick v. Penn Brook Coal Co.*, 110 Pa. Superior Ct. 444, 448-9, 168 A. 691; *Dobach v. Jeddo-Highland Coal Co.*, 141 Pa. Superior Ct. 62, 65-67, 14 A. 2d 842; *Shetina v. Pittsburgh Term. Coal Corp.*, 114 Pa. Superior Ct. 108, 173 A. 727. Furthermore, we held in *Smith v. Union Collieries Co.*, 155 Pa. Superior Ct. 389, 38 A. 2d 407, that in a proceeding, brought within a year, to reinstate a compensation agreement, where it was established that disability had recurred or was aggravated, the final receipt ceased to have significance. The important question, then, is the claimant's disability, its recurrence or aggravation and extent.

Under the evidence in this case the claimant's return to work on January 5, 1942 was tentative and experimental. He is not to be penalized because he wanted to go back to work and was willing to give it a trial. A trial showed that he could not go up and down stairs, stoop, or do work that required a sudden change of the head with relation to the body. Before the accident he was in general good health. Since his injury he has had intermittent pains in the back of his head that come on suddenly and may last for a few minutes or for hours; he has attacks of dizziness when he stoops or lifts anything, and when he goes to bed at night; he has weakness in both legs, his knees feel as if they were going to buckle under him; his sleep is broken, many nights he is not able to sleep more than an hour or two. On one occasion while walking on the street in Philadelphia his legs gave way and he slumped to the sidewalk were he had to be assisted to his feet.

Dr. Yaskin explained all these things as symptoms of a post concussion syndrome:

When asked, "In your opinion, is a man suffering from that condition able to do any work", he replied:

"Sometimes they are able to do work, sometimes the condition may be so mild they can continue; they can't work if the symptoms are so severe that it is a hospital case, based on my evaluation. This case at the present time is marked disability but it is possible for him to do some light type of work ...... The percentage of disability depends on the type of work he is going to do. By the referee. Q. What is the percentage of disability? A. It depends on the type of work he was to do; if he was to do laboring work requiring ...... By Mr. Chadwick. Objected to ...... The witness. A. This man is frequently required to change position, the head with relation to the trunk, have to walk up and down stairs, if he has to stoop, he is disabled one hundred per cent; if he got a job sitting at a desk where he would keep stationary without changes of posture of the head or changes in routine, he can do a great deal of work; if he is a clerk he still has some disability; if he is a guard he is one hundred per cent disabled; under certain conditions if he had to open doors which would require motion of the head he is markedly disabled. I am speaking for the present. By the referee. Q. Is he able to go up and down flights of stairs? A. He might be capable at times; he might have to stop if he got that feeling coming on or his surroundings were spinning. Q. Would he be able to go out and drive in traffic, move automobiles?[1] A. He might be able to; *I wouldn't want him to drive in traffic if I was going there.* By Mr. Ambler. Q. This condition eventually will improve. A. I believe it will improve, yes."

On cross-examination, he testified, inter alia, as follows: "Q. Your testimony seems to be predicated on the statement made to you that this man was unconscious

---

[1] This was relevant in view of the fact that since his discharge claimant has had irregular employment driving funeral cars once or twice a week for an undertaker. He has tried without success to get other work.

over a period of two days? A. No, I am assuming that
he was unconscious no more than half an hour; apparently there was something wrong with his consciousness for a couple of days. Q. Why days? A. I questioned him most carefully, the fact that Doctor Frazier
just kept him in the hospital; it is not fractured limbs.
Q. Fractured skull? A. Yes, one who has a fractured
skull has a serious brain injury; discarding the fractured
skull, he must have seen that this man had a major
cranial trauma ...... Q. You testified that he would
suffer if he had occasion to turn his head to the right
or left, that is not much? A. I wouln't make it quite
so simple. If a man has post concussion syndrome, a
*sudden* change of this sort (turns head) causes them to
feel spinning and gradually to get the habit of limiting
their movements very slowly. Q. This would seriously
interfere with the patient's doing heavy labor? A.
Heavy labor or any work requiring sudden changes of
the position of the head ...... Q. Frankly and fairly,
if this man has unintentionally or otherwise exaggerated
the immediate effects of the accident and has misled us,
or you perhaps unintentionally, as to whether he was
unconscious after the accident, would that effect your
general judgment in this case? A. You used the word
"immediate"? Q. Yes. A. I don't think it would, because if the man was injured enough to have a fractured
skull, and injured enough for Doctor Frazier to keep
him in the hospital 20 [26] days, I am inclined to believe what he said, and what's more, based on my personal observation of at least many hundreds and thousands of post concussion syndromes, I don't believe he
is exaggerating his present complaint; there is something characteristic about a person who has that which
distinguishes them from a neurotic or malingerer, not
quite clear cut, they [neurotics and malingerers] betray
themselves by changeable symptoms; a post-concussion
individual, whether a child or a man, has exactly the

same story, they say they have a headache, it isn't here all the time, dizziness, not dizzy all the time, only certain times; irrespective of color, culture, education, they have the same story."

We are of opinion that considering Dr. Yaskin's evidence and the testimony of the claimant, which we do not deem it necessary to cite, the referee was justified in fixing the disability of the claimant, due to the accident, at the time of the hearing, at fifty per cent. The probability is that his condition will improve and the percentage of his disability is always subject to change. The referee and the board must have same leeway, just as a jury does in a personal injury case, in estimating the percentage of disability or loss of earning power, (*Svestka v. Union Collieries Co.,* 149 Pa. Superior Ct. 468, 27 A. 2d 675), and we do not find their action to have been arbitrary or unreasonable. The claimant here does not claim total disability since March 27, 1942—only partial.

The court below was influenced greatly in its opinion —but not in its order—by our decision in *Tomlinson v. Hazle Brook Coal Co.,* 116 Pa. Superior Ct. 128, 176 A. 853, where we held, in a proceeding by the employer to terminate a compensation agreement for *total disability,* that the employer's exceptions to the findings of the board that the claimant was still *totally disabled* should have been sustained by the court below *and the record remitted to the board for further hearing and determination,* where the record then before us showed uncontradicted evidence presented on behalf of the defendant that claimant had during his alleged total disability worked for a number of other employers, that he had performed certain physical acts inconsistent with total disability, and that the defendant was willing to employ him at light work, as to which no findings were made by the referee or board. The court below, in the present case, apparently, was not aware of our action

on the return of that case—134 Pa. Superior Ct. 277, 4 A. 2d 192—where after the board had reopened the case and heard additional testimony and found that claimant still suffered a *partial* disability, although he was able to do light work, we affirmed the lower court in dismissing the employer's appeal, and sharply criticized the latter's failure to supply the claimant with the light work it had represented it was willing to give him, saying inter alia, "The present appeal ...... is wholly lacking in merits and has only delayed for more than two years the payment to claimant of a just claim for partial disability and thereby increased the interest charge against the employer." (p. 278)

On full consideration of the case we are of opinion that the court below assumed certain of the functions placed exclusively by the Workmen's Compensation Act upon the board; that the findings, conclusion and order of the board were supported by sufficient competent evidence, and that the order of the court must be reversed, and the record remitted with directions to dismiss the appeal and enter judgment for the claimant pursuant to the provisions of the Act. See *Graham v. Hillman Coal and Coke Co.,* 122 Pa. Superior Ct. 579, 186 A. 400; *Petrulo v. O'Herron Co.,* 122 Pa. Superior Ct. 163, 186 A. 397.

It is so ordered.

PER CURIAM, January 25, 1945.

The foregoing opinion had been prepared by President Judge KELLER before his death on January 16, 1945. It is now adopted and filed as the opinion of the Court.